UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE: )
)
LUTHER T. SMITH, JR. )
)
    APPELLANT/CROSS-APPELLEE, )
)
v. ) Case No. 3:07-0655
) JUDGE ECHOLS
THE OHIO NATIONAL LIFE, )
INSURANCE COMPANY, )
)
    APPELLEE/CROSS-APPELLANT. )

## MEMORANDUM

Pending before the Court is the direct appeal from an apparently[1] final Bankruptcy Court "Order Granting Nondischargeable Partial Summary Judgment" dated April 25, 2007. In that Order, the Bankruptcy Court determined Defendant The Ohio National Life Insurance Company ("Ohio National") was entitled to a nondischargeable judgment against Plaintiff Luther T. Smith, Jr. ("Smith") in the amount of $1,856,108.80 for commissions paid to Smith while he was acting as Ohio National's agent. The Bankruptcy

---

[1] The decision "appears" to be final even though it is characterized as an Order relating to partial summary judgment because it apparently resolves the claims between Plaintiff and Ohio National Life Insurance Company. For his part, Plaintiff notes "there may be an issue as to the finality of this Order" but believes that all issues between the parties "were either pretermitted or subsumed within the decision and Order." (Docket Entry No. 7 at 1 n.1). Plaintiff then "leave[s] to Ohio National the burden of raising the finality issue, if thought to be significant." (Id.). For its part, Ohio National does not contest the finality of the Bankruptcy Court's Order.

1

Court determined Smith had engaged in "rebating" the premiums paid by his customers, that is, used his commission to give the purchaser of an insurance policy a "rebate" on the premium paid for the policy, thereby enticing the insured into purchasing the policy. The Bankruptcy Court declined to order prejudgment interest and dismissed Smith's counterclaim for unpaid commissions against Ohio National.

The parties have filed cross-appeals. Smith challenges both the entry of judgment in favor of Ohio National and the dismissal of his counterclaim. Ohio National filed a cross-appeal challenging the denial of prejudgment interest, but in its brief, withdraws the argument, recognizing that the Court has discretion in determining whether or not to award prejudgment interest. (Docket Entry No. 13 at 21).

## I. **FACTUAL BACKGROUND**

This appeal presents the issue of whether the Bankruptcy Judge erred in concluding, based on the summary judgment record, that Smith wrongfully engaged in rebating commissions to provide an incentive for individuals to purchase life insurance policies from Ohio National. The basic background facts underlying that conclusion are as follows.

Smith has been an insurance agent since 1971, focusing primarily on selling life insurance policies. On April 16, 1999, Smith signed a General Agent Contract ("contract") to become a

2

licensed life insurance agent for Ohio National. As a part of that contract, Smith agreed to abide by Ohio National's practices, including its Business Practice Guide for Agents ("Guide"). This Guide provided that "the Company does not permit rebating of premiums in any state" and notes that there are laws against anti-rebating in most states. (Docket Entry No. 8-1). In a summary section of the Guide there are "reminders," including a reminder that, pursuant to Ohio National's business practices, agents "<u>should carefully avoid</u> . . . rebating premiums or commissions[.]" Id. (emphasis in original).

During the relevant period, Smith engaged in what he characterizes as "premium financing." Through closely held corporations, he loaned money to customers to pay for the premiums on life insurance policies sold to them. The funds for these loans were through the use of a personal line of credit in Smith's name. When he received commissions, he would use those sums to pay down the line of credit. The "loans" given to the insureds were nonrecourse "loans," although Smith claims the underlying policies served as collateral for the loans. Whether any of the "loans" were repaid is an open question.

Upon the sale of Ohio National whole life and universal life policies to his customers, Smith generally received 105% of the amount of the first year's premium. He sometimes would receive a

3

significantly smaller amount in commissions in the second year of each policy.

Ohio National claims what Smith actually did was to rebate premiums to customers based on his commissions. Ohio National claims it knew nothing of Smith's alleged rebating, or that any entity that Smith controlled was providing financing for the first year's premium in the manner set forth above. Ohio National claims that had it known Smith intended to be or was involved in rebating as a means of inducing customers to purchase Ohio National life insurance polices, Ohio National would not have entered into the General Agent Contract with Smith, or issued any of the policies sold by Smith. (R. 1.20, Response to Statement of Facts, ¶ 65).

Rebating is not defined in the Guide. However, Ohio National asserts that Smith admits commission "rebating occurs when an agent splits the commission paid to the agent by the insurance company with the insured." (Docket Entry No. 13 at 6). While Smith made such an admission in his Interrogatory responses (Docket Entry No. 1-30 at 4), he did so "subject to" his Declaration. In his Declaration, Smith claims that there are different types of rebating (such as premium rebating by the insurance company, and commission rebating by the agent), yet he also maintains that "[t]here is no generally accepted definition of what rebating is in our industry." (Smith Decl. ¶ 5). In response to Ohio National's interrogatories, Smith disputes Ohio National's contention that

4

"[r]ebating consists of any agreement or attempt to share his commissions, directly or indirectly, with his customer as an inducement to enter into, or purchase, the insurance agreement." (Docket Entry No. 1-20 ¶ 9). Further, in his Declaration, Smith states that "I did not intend to, nor did I in fact engage in rebating as a means to induce applicants to apply or purchase or retain Ohio National Policies." (Smith, Decl. ¶ 18). Smith also states that he "never split a commission with an insured" and "never paid commission dollars to an insured." (Smith Decl. ¶ 33). Instead, Smith maintains he engaged in "premium financing" which is distinct from either premium rebating or commission rebating and which is permitted by law and engaged in by both insurance companies and insurance agents. (Smith Decl. ¶ 25).

Regardless of how the transactions are characterized, when Ohio National learned of Smith's practices it investigated and determined that Smith sold at least 25 whole life and universal life policies, all of which lapsed within five years, and most of which lapsed within the first two years. This was contrary to expectations since these types of policies are generally long-term insurance products with low lapse rates. Because of the low lapse rates, the policies are structured in such a way that they are not profitable until approximately five years into the premium payment schedule. Based on its investigation, Ohio National terminated the contract with Smith and claimed forfeiture of any commissions to

which Smith might otherwise have been entitled based upon the undefined term "misconduct" in the contract between the parties.

Subsequently, Smith filed for bankruptcy under Chapter 7 of the Bankruptcy Code. Ohio National filed an adversary proceeding, alleging fraud, breach of contract, and violation of the Tennessee Consumer Protection Act in his receipt of commissions. Smith filed a counterclaim for unpaid commissions. The Bankruptcy Court found in favor of Ohio National, deemed the debts nondischargeable, and dismissed Smith's counterclaim.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), which is made applicable to adversary proceedings and contested matters in bankruptcy cases by Federal Rules of Bankruptcy Procedure 7056 and 9014, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This Court reviews *de novo* the Bankruptcy Court's decision to deny summary judgment. In re Batie, 995 F.2d 85, 88-89 (6th Cir. 1993).

## III. ANALYSIS

The Bankruptcy Court found that Smith owed a nondischargeable debt to Ohio National pursuant to 11 U.S.C. §523(a)(2)(A) as a

result of the "misconduct and fraud" by which Smith obtained commission money from Ohio National. The Bankruptcy Court opined that Smith's method of providing non-recourse "loans" was nothing more than rebating. Accordingly, the court found that Ohio National demonstrated the debt was nondischargeable. The Bankruptcy Court further found that Smith received at least $1,856,108.80 in commission payments from Ohio National as a result of what it found to be rebating, and that this amount was nondischargeable in Smith's bankruptcy.

Under the Bankruptcy Code, exceptions to discharge are strictly construed against the creditor. In re Rembert, 141 F.3d 277, 281 (6th Cir. 1998). To except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must show by the preponderance of the evidence "(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." Id. at 280-81. The Bankruptcy Court concluded that Ohio National established these elements.

In reaching its conclusion, it is apparent the Bankruptcy Court placed substantial reliance upon the Affidavit of Molly Akin,

7

a "Senior Agency Auditor" with Ohio National.[2] Such reliance may have been misplaced in certain regards because the Affidavit contains hearsay statements, is not shown in parts to be based upon independent and personal knowledge, and contains legal conclusions which apparently were accepted by the Bankruptcy Court.[3] Moreover, many of the things that Akin claims in her Affidavit are directly disputed, or at least called into question, by Smith's Declaration.

Apart from identifying herself as a "Senior Agency Auditor," Akin's role with Ohio National, and particularly the Smith matter, is not made clear. It is not clear whether Akins is offered by Ohio National as an expert pursuant to Rule 702 of the Federal Rules of Civil Procedure. If so, Akins must be qualified as such based upon her knowledge, skill, experience and/or training, and it must be shown that her testimony is based upon sufficient facts or data and that she utilized reliable principles and methodologies to arrive at her conclusions. No showing has been made with respect to any of the requirements of Fed. R. Evid. 702 in relation to

---

[2] In its brief, Ohio National argues that the Court should not consider any challenge to Akin's Affidavit because the issue was not properly presented to the Bankruptcy Court. This Court disagrees. In his Memorandum in opposition to the Motion for Summary Judgment, Smith specifically requested that the Bankruptcy Court "exclude this declaration from the summary judgment record," claiming it was not based on personal knowledge and characterizing it as a "hearsay-laden conclusory declaration[.]" (Docket Entry No. 1-23 at 2).

[3] The Court notes that Smith's Declaration suffers from some of the same deficiencies. This is all the more reason to further develop the factual record in this case.

8

Akins. Alternatively, Akins may have submitted her affidavit as a lay witness offering an opinion under Fed. R. Evid. 701. If so, Rule 701 requires that her opinions or inferences be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope or Rule 702." Fed. R. Civ. P. 701. Many of the statements and conclusions offered by Akins have not been shown to be based upon her perceptions, while some may be based on specialized knowledge. In addition to [the] issue of whether Akins is offering expert or lay opinion testimony, Akins makes many statements in her Affidavit which appear to be based upon company records, but she does not show that such records are trustworthy and would be admissible in evidence. For example, she does not describe the records, or explain how the information is recorded and maintained, whether the entries were made when the event or information was transmitted by someone with knowledge, who keeps the records, whether there is a business duty to keep the records, and whether such records are accurate, or that such records are kept in the ordinary course of business.

Akin also claims that Ohio National auditors traveled to Smith's office and that they attempted to conduct an audit, but Plaintiff did not cooperate. It could be that Akin was an auditor

9

involved in the investigative process, but that is not clear. Smith claims he has never met Akin, and denies that he did not cooperate in the investigation.

Akin claims that Ohio National informed Smith that rebating and bartering were not permitted practices by Ohio National, and Smith acknowledged this at the time he signed the agency contract, but she does not state how she obtained this knowledge. Smith claims this "is simply not true." (Smith Decl. ¶ 4). Maybe Akin is referring to the Guide's admonition relating to rebating, but that document does not define rebating and hence it cannot be definitively said that both Ohio National and Smith understood what prohibited rebating involved.

Akin also states that "rebating and bartering consists of any agreement or attempt by an insurance agent to share his commissions, directly or indirectly, with his customers as an inducement to enter into, or purchase, an insurance agreement." (Akin Aff. ¶ 5). The source of that definition is not explained, but Akin goes on to state that based upon her reading of Smith's deposition, Smith engaged in rebating. The record doe not describe her qualifications to issue opinions concerning those factual and legal conclusions. In any event, Smith claims "there is no generally accepted definition of what rebating is in our industry" and that he did not give his customers all or any part of his

10

commissions as an inducement for them to sign policies with Ohio National. (Smith Decl. ¶¶ 5, 33, 34).

Akin also issues opinions about Ohio National and its intentions, yet does not indicate how she is aware of such things. For example, she claims that Ohio National was unaware Smith's customers were receiving loans from an entity controlled by Smith and that if Ohio National had been aware Smith was providing such loans it would not have issued life insurance policies for those potential insureds.

Akin also speaks about industry standards, but does not show the basis of her expertise in the overall industry. For example, she claims that whole life and universal life products are considered "permanent" in the industry, something which Smith directly disputes. (Smith Decl. ¶ 7).

Akin also attaches a spreadsheet to her Affidavit which purports to contain a true and correct summary of each policy allegedly purchased through the rebating scheme and the commissions paid on those policies. However, the preparer of the spreadsheet is not made known, nor is the underlying basis for the conclusions presented in spreadsheet. Smith disputes the information on the spreadsheet, as well as the conclusions reached by Akins. Smith claims the spreadsheet is misleading and not all-inclusive of his performance because it omits a number of Ohio National policies that were financed by Ohio National and includes other policies

11

that were not financed by Smith. Further, Smith claims many of the policies listed on the spreadsheet predate the Guide which purports to ban (the undefined) "rebating."

Akin also claims that the policies in question lapsed earlier than five years after issuance as a direct result of Smith's "rebating" practice. However, there is no independent proof or evidence of personal knowledge about why the policies lapsed. Without more persuasive evidence, it cannot be presumed that all the listed policies lapsed because of Plaintiff's so-called rebating scheme. For example, it is plausible that one or more of the policies may have lapsed for other reasons such as marriage, death, change in income, the introduction of a new policy with better terms, the policyholder going elsewhere, the policyholder no longer desiring the coverage, or for any of countless other reasons.

Akin also claims that "[h]ad Ohio National known that Smith intended to provide loans for his customers . . . as a means of inducing customers to purchase Ohio National life insurance policies, Ohio National would not have entered into the General Agent Contract with Smith, would not have issued any of the life insurance policies sold by Smith in this manner, and would not have paid him commissions on such sales" (Akin Aff. ¶ 45). Whether this is true or not is disputed. Smith claims that it is not uncommon for insureds to finance payments of premiums, either through the

12

company itself or an agent, and, in fact, Smith states "it is usual for purchasers of these 'high premium' products to use borrowed money." (Smith Decl. ¶ 31). There is a genuine dispute about this material fact. It simply cannot be determined based on Akin's conclusory statement whether "premium financing" (if that is what Smith did) would have been permitted when the policies in question were sold and before they lapsed.

The Bankruptcy Court may well have been correct in determining that Smith's actions constituted improper rebating, that Ohio National is entitled to a nondischargeable judgment in the amount of $1,856,108.80, and that Smith's counterclaim consequently should be dismissed. Although, Smith's actions in this case may look suspicious and some of his explanations do not appear to be satisfactory, "[e]ven if the [trial] court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006).

The record presents a hotly contested dispute about whether Smith's actions constituted impermissible "rebating" under his contract with Ohio National. The primary proof on this issue boils down to a swearing contest between Akin and Smith. Akin states that she believes Smith engaged in rebating, which is prohibited by his contract and industry practice. Smith claims rebating is not uniformly defined in the insurance industry, that Ohio National and

13

others sometimes finance insured's premiums, and that his loan program was simply a form of premium financing which is allowed in the industry.

Stated simply, there are numerous issues of material facts which are strongly disputed by the parties and which cannot be resolved based upon the paper record before the Court. When Akin's Affidavit is juxtaposed with Smith's Declaration and deposition testimony, many questions remain, including, without limitation, the following: (1) what actually constitutes rebating under Smith's contract and within the prohibition of Ohio National's Business Practice Guide; (2) is there a distinction between rebating and premium financing and, if so, whether Smith's actions amounted to rebating or premium financing; (4) if Smith's actions constituted premium financing, whether that amounted to "misconduct" under Smith's contract with Ohio National; (5) whether each of the listed lapsed policies were caused by Smith's premium loan program or some other reason; and (6) whether such action was so egregious as to except Ohio National's claim for past paid commissions to Smith from discharge under 11 U.S.C. § 523(a)(2)(A), and, if so, what amount of damages, if any, is Ohio National entitled to recover.

It is settled that a judge may grant summary judgment for a moving party only where there are no genuine issues of material fact in dispute and the moving party is entitle to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bktcy P. 7056;

14

Celotex Corp., 477 U.S. at 322. "Summary judgment cannot be used to resolve swearing contests between litigants." Payne v. Paule, 337 F.3d 767, 770 (7th Cir. 2003). This is because "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." GMC v. Lanard Toys, Inc., 486 F.3d 405, 412 (6th Cir. 2006).[4] Based on the entirety of the record, the Court must conclude that the Bankruptcy Court erred in weighing the evidence and therefore its opinion granting summary judgment in favor of Ohio National will be reversed.

## IV. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's April 25, 2007 "Order Granting Nondischargeable Partial Summary Judgment" will be reversed and the case will be remanded to the Bankruptcy Court for further proceedings.

An appropriate Order will be entered.

*[signature]*
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

---

[4] In its opinion, the Bankruptcy Court stated "[t]he facts in the present case are virtually indistinguishable from those found in the Tennessee Court of Appeals case of Freeman v. Thompson, 600 S.W.2d 234 (Tenn. Ct. App. 1979). (Order at 5). Tellingly, Freeman involved an appeal after a bench trial before the Chancellor, and was not decided on summary judgment.

15

Case 3:07-cv-00655    Document 14    Filed 03/24/08    Page 15 of 15 PageID #: 744